26 C.C.P.A. (Patents)

## RIEMENSCHNEIDER v. MATTHAEI.

Patent Appeal No. 4087.

Court of Customs and Patent Appeals.
May 1, 1939.

Rehearing Denied June 15, 1939.

Donald A. Gardiner, of Washington, D. C., and Louis W. Helmuth, of Cleveland, Ohio, for appellant.

Pennie, Davis, Marvin & Edmonds, of New York City (Dean S. Edmonds, of New York City, and Clarence M. Fisher, of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in an interference proceeding from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences awarding priority of invention of the subject matter defined in the appealed counts, Nos. 1 to 12, inclusive, to Frederick C. Matthaei, appellee.

The invention relates to improvements in automobile frames, and a method of making the same.

Counts 4 and 12 are illustrative of the appealed counts, and sufficiently describe the automobile frame and the method of making it. They read:

"4. The method of making an automobile chassis frame which comprises bending two elongated sheet metal strips on longitudinal lines to form tubes, each having a single longitudinal seam, welding each tube along the seam therein to form a tubular side-member for the frame, and securing the two side-members together in spaced relation by cross-members whose end portions are secured to the side-members."

"12. In an automobile chassis frame comprising the combination of two side members each formed from a single piece of sheet metal which is bent along lengthwise lines so that the metal of the piece from one lateral edge to the other forms the four sides of a rectangular tubular member presenting a single lengthwise seam

and having the seam edges welded together, each of said side members being curved in the direction of its length, and a plurality of cross-members connecting the side members together in spaced relation and each having each of its ends secured to a side member."

The present interference, No. 70,590, is a consolidation of former interference No. 70,590, involving the method counts, and interference No. 71,492, involving the article counts. The consolidated interference involves two patents of appellee, No. 1,-992,710, issued February 26, 1935, on a divisional application, Serial No. 709,603, filed February 3, 1934 (the original application, Serial No. 684,614, having been filed August 11, 1933), and No. 2,009,963, issued July 30, 1935 on original application Serial No. 684,614, and appellant's co-pending application No. 668,860, filed April 19, 1933.

The method counts here involved originated in appellee's patent No. 1,992,710, and the article counts originated in his patent No. 2,009,963.

■ Appellee is the junior party and the burden was upon him to establish priority of invention by a preponderance of the evidence.

The tribunals of the Patent Office concurred in holding that appellant was entitled to November 28, 1932, for conception, and April 19, 1933, the date of the filing of his application, for constructive reduction to practice; that appellee was entitled to August 16, 1932 for conception; that appellee was diligent at and immediately prior to November 28, 1932, when appellant entered the field, and thereafter until he filed his original application August 11, 1933, and, accordingly, awarded priority of invention to appellee. Those tribunals also concurred in holding that appellee had failed to establish actual reduction to practice at any time prior to the filing of his original application.

Counsel for appellant contends in this court that appellant is entitled to a date prior to November 28, 1932 for conception.

We have carefully examined the record in the light of the arguments presented here by counsel for appellant, and conclude that the tribunals of the Patent Office were right in holding that appellant failed to establish conception prior to the date awarded him, November 28, 1932.

It is contended by counsel for appellee that the Board of Appeals erred in not holding that appellee had successfully reduced the invention to practice by the building of an automobile frame (hereinafter referred to as frame No. 3) in conformity with the involved counts, and testing it, which testing was completed on April 13, 1933, a few days prior to the filing of appellant's application (April 19, 1933); that appellee was the first to conceive the invention and the first to reduce it to practice, and is entitled to an award of priority.

It clearly appears from the evidence of record that the results of the tests on appellee's frame No. 3 were not satisfactory; that the frame did not have the desired strength; and that, as stated by appellee's witness Reginald J. Reardon, welding engineer in the employ of appellee's company, "as far as the wiggle test [vibration test] is concerned, it gave us a poor reaction." That frame was discarded, and immediately thereafter appellee, as will be hereinafter more fully explained, constructed and tested frames Nos. 4 and 5. The exact date of the completion of those frames does not appear of record.

Appellee testified that the parts for frames Nos. 4 and 5 were received at his plant on April 18, 1933; that the work of assembling those parts commenced immediately thereafter; and that they were assembled within 24 to 48 hours. Assuming that the frames were finished within the 48-hour period as stated by appellee, they probably were ready for tests on April 20, 1933. It appears from the record that the tests on those frames were completed on April 24, 1933.

The tribunals of the Patent Office were of opinion that the evidence was insufficient to warrant a holding that the building and testing of those frames amounted to a successful reduction to practice, the Examiner of Interferences stating that the results of the tests were not clearly explained, and that the evidence was not sufficient to establish that the frames were satisfactory.

■ We have carefully examined the evidence of record, and are of opinion that appellee failed to establish that the building and testing of frames Nos. 3, 4, and 5 amounted to a successful reduction to practice of the involved invention.

The real issue in the case is whether appellee was diligent at and immediately prior to November 28, 1932, when appellant entered the field, and thereafter until he filed his original application—August 11, 1933.

It will be observed that the appealed article counts are limited to an automobile frame having "two side members each formed from a single piece of sheet metal which is bent along lengthwise lines so that the metal of the piece from one lateral edge to the other forms the four sides of a rectangular tubular member presenting a single lengthwise seam and having the seam edges welded together, each of said side members being curved in the direction of its length."

In his decision, the Examiner of Interferences stated that the method defined in the appealed method counts was the "obvious and only way the frame can be made," and that the "disclosure of the method would be inherent in a disclosure of the article." That statement has not been challenged in this court by counsel for either of the parties.

It appears from the record that in the fall of 1931 appellee and his witnesses constructed an automobile frame substantially in conformity with the involved counts, except that its side-rails were composed of three pieces welded together. Each piece composing the side-rails was made in appellee's plant from a single sheet of metal. The two end members were bent longitudinally to provide arches over the front and rear axles. It appears that that frame was given shop tests at appellee's plant for the purpose of determining its degree of rigidity, and, as stated by appellee's witness Reginald J. Reardon, "what other characteristics it might have which would influence us in the making of other frames; to alter anything that we might find wrong." The frame was badly distorted by the tests to which it was subjected, and was discarded.

It further appears from the record that in August, 1932, appellee, deeming it advisable to employ one more conversant in calculating the stresses and strains in automobile frames, secured the assistance of one A. E. Wilson, who, it is claimed by appellee, prepared appellee's Exhibit No. 1, which consists of seven sheets of sketches showing a proposed "side member section for tubular chassis frame" and other parts thereof. The first two sheets of the exhibit are dated September 7, 1932, and bear the name A. E. Wilson. Appellee identified the exhibit, but did not clearly explain it. Mr. Wilson was not called as a witness, and no other witness either identified or explained the exhibit.

Appellee testified that the first sheet of the exhibit showed the dimensions of the cross-section (4⅛ by 1¾ inches), the gauge of the stock, and the position of the weld for "the side member of the tubular frame"; that the second sheet disclosed a cross-section of the side-rail and an assembly of a cross-member attached thereto; and that the third, fourth, fifth, sixth, and seventh sheets disclosed cross-sections of a side-rail showing different dimensions and gauges of stock from which calculations might be made for computing weight. He then testified as follows:

"Q109. And all of these several forms, what is represented with respect to whether or not the side-member was made from a single piece of sheet metal, folded up to a tubular form, with a single lengthwise seam? A. *The width of the blank in each case would be indicative of the fact that it would be a single strip.*

"Q110. A single seam? A. Yes, a single seam." (Italics ours.)

It will be observed that appellee did not testify positively that the exhibit discloses or was intended to disclose a one-piece side-rail conforming to the limitations contained in the involved counts.

Counsel for appellant contend that appellee's Exhibit No. 1 does not necessarily disclose a one-piece side-rail, and that the conduct of appellee subsequent to the making of the exhibit indicates clearly that the exhibit was not intended to disclose a one-piece side-rail.

It appears from the record that on August 16, 1932, prior to the employment of Mr. Wilson, appellee made a sketch (Exhibit No. 3) of a frame corresponding to the article counts here involved so that he would have some tangible evidence to establish his conception of the invention prior to his disclosure to Mr. Wilson.

On or about September 15, 1932, subsequent to the making of the Wilson sketches, appellee began the construction of a second frame having three-piece side-rails. This frame was completed and tested in December of that year. It was subjected to both deflection and vibration

tests. The cross-section of the side-rails in that frame conformed to the dimensions shown in appellee's Exhibit No. 1, and in that respect only differed from the frame made and tested in 1931—the cross-section of the side-rails in the first frame being 5 by 2 inches, and in the second frame 4⅛ by 1¾ inches. Appellee stated that due to vibration the frame sections broke near the openings in the side-rails and adjacent the joints in the side-rails between the front and rear arches. Appellee's witness Russell Paquette, superintendent for appellee's company (the American Metal Products Company), also testified that the side-rails in the second frame broke near where the pieces were welded together.

In view of the fact that the invention here involved is limited to a one-piece side-rail, the question that naturally occurs is why did appellee test two frames having three-piece side-rails when the invention he claims to have conceived in 1931 and which he disclosed in August, 1932, was a frame having one-piece side-rails. In explanation, appellee stated that "It was practically impossible to produce a side-rail of one piece. There was no adequate equipment available. *The means known for the bending longitudinally were limited;* and, taken all in all, it was a matter of ease and simplification, building this side-rail in three pieces rather than one, on these experimental jobs. * * * The production of a side-rail in a single piece, the logical manner of doing that, is by means of a rolling mill. It had been in our minds continuously from the inception of this idea that there was no rolling mill available for the forming of a single flat strip into a tubular rectangular form, in its entire length," and that it was impossible at that time (December, 1931 to December, 1932) for his company to produce a one-piece side-rail. (Italics ours.) Appellee further testified as follows:

"Q175. Is it correct to say that this procedure, *in making a side-rail out of three parts welded together, was a departure from your basic idea as to how the thing should be made?* A. *By all means.*

"Q176. What did you have in mind through the period of 1931 and 1932, on this score, when, as a matter of fact, you were having frames with side-rails made in three pieces instead of one? A. Comparisons had to be made with other standard frames that were available. *Our ob-*ject in building a frame, irrespective of the method produced, was to gain experience and make comparisons. We were concerned to a great extent with the manner in which the bending longitudinally would take place on the side-rail.*

"Q177. How to do it, and with what apparatus, gave you considerable concern? A. That is correct.

"Q178. Why was it that that was a matter of such concern? A. Well, that had not been done, as far as we had known, prior to that time, by anyone throughout the United States, or any other place, as far as we knew. A great deal of experimental work, we felt, had to be done. We were attempting to do it with the least amount of expense, and with the greatest ease, and likewise with the least amount of time necessary· to be required by our foremen, engineers, and executives who were available for that work.

"Q179. While you were passing through this experimental work, and particularly trying to study the methods and apparatus for giving the side-rails the necessary lengthwise curvature, *did you anticipate any difficulty in making the side-rails of a single piece, when you got around to production?* A. *None whatsoever. The rolling mill was a standard piece of equipment that could be purchased in any one of a half a dozen different places.*

"Q180. *Then, is it correct to say that you used the three-piece construction only because you did not have the requisite equipment for making it in one piece. A. Not entirely. The bending of it was a problem. It would facilitate, for the time being anyway, long experimental assemblies, to do that work in a shorter section rather than an entire section.*

\* \* \* \* \* \*

"Q193. I wish you would state what was your purpose in making this second frame, which, I take it, followed more or less the general features of the construction in the first one; what was the purpose in making the second one? And, state whether or not that purpose was attained? A. We had felt that we had gained considerable further advice, during the past several months, *pertaining to frame design and construction. We likewise felt that the industry was probably a little closer to a type of frame such as we had in mind; and we likewise felt that the reduction in the weight and cost would be more attrac-*

*tive to us as a means of influencing us in the future development of the assembly.* We had never lost sight of the fact that were this to become a product adopted by some manufacturer, *that it would give us a marvelous outlet for the product which we were familiar with and had been experienced in making for a great number of years;* likewise, it would give us a field that we felt would exclude the other tube manufacturers,—and, from that standpoint, it would better our situation considerably.

\* \* \* \* \*. \*

"Q209. What was the *general indication of your experience with that second frame,* and the tests that you made of it, as to the value and prospect of this new type of frame? A. Well, we were greatly buoyed up by our experience and the testing and building of that frame, *so much so that we decided to proceed with the expenditure of further money by producing our next frame with the side-rails in one piece.* That frame was later produced, in the spring of 1933." (Italics ours.)

It appears from the testimony of appellee that he and his company had done considerable business with the Motor Metals Manufacturing Company which was located directly across the alley from appellee's plant; that, as stated by appellee, "I happened to be in conversation with Mr. Shanahan [of the Motor Metals Manufacturing Company] one day [when, he did not state], in an effort to find out where we could have these 160-inch lengths [the proper lengths for one-piece side-rails] formed into a rectangular tubular shape, and it was through his assistance and his contact," that he (appellee) was able to have seven pieces for one-piece side-rails made into tubular forms by the General Motors Truck Company at Pontiac, Michigan. The metal for those one-piece side-rails was obtained from the Great Lakes Steel Company where appellee had obtained the metal for his first and second frames. The one-piece side-rail tubes made by the General Motors Truck Company were welded, and the front and rear arches formed in appellee's plant with "practically" the same equipment that was used to form the front and rear arches in the side-rails used in the first and second frames. The frame was then assembled by appellee's employees in his plant from working drawings made on March 22, 1933.

It appears from the record that that frame was given the same deflection and vibration tests to which the second frame had been theretofore subjected. We have hereinbefore held that the evidence of record was not sufficient to establish that the building and testing of that frame, the testing being completed on April 13, 1933, amounted to a successful reduction of the invention to practice.

Immediately after the completion of the tests on the third frame, four of the tubes manufactured by the General Motors Truck Company, after being welded in appellee's plant, were delivered to the Epworth Manufacturing Company, which was within half a block of the plant of appellee's company, where they were bent to form arches for the front and rear axles. They were then machined by the Trio Tool Company, which was directly across the street or alley from the Epworth Manufacturing Company, assembled into frames, referred to in the record as frames Nos. 4 and 5, in appellee's plant, and tested under the supervision of the Detroit Testing Laboratory. The tests, on those frames were apparently completed by April 24, 1933. Frames Nos. 4 and 5 are in evidence as appellee's physical Exhibits Nos. 13 and 14.

The witness Paquette testified that the reason appellee did not provide the first two frames with one-piece side-rails was because there were no facilities in his plant for forming them. On cross-examination, his attention was called to the fact that, shortly after the completion of the tests of the second frame, appellee had no difficulty in making the necessary arrangements for the production of one-piece side-rails for the third frame produced and tested. With regard thereto, he testified as follows:

"XQ276. You later had facilities, by going through the G. M. Truck Company, to have them formed in one single piece, and, later, by the Epworth Company, to bend them? A. Yes.

"XQ277. Why wasn't that procedure carried out in the beginning? A. *Because we had no one we could trust, no one we wanted to divulge something to.*

"XQ278. *You trusted them subsequently, didn't you?* A. Yes.

"XQ279. *Why not earlier?* A. *Mr. Matthaei's wishes were not to go ahead and divulge it to anybody.*

"XQ280. What changed the situation from that wish not to divulge it at that time, to divulging it later on to other par-

ties? A. I do not know. Mr. Matthaei gave the orders, and I followed his orders."

It is contended here by counsel for appellant that appellee's activities at and immediately prior to the time appellant entered the field, November 28, 1932, and, thereafter, until April, 1933, when, for the first time, appellee constructed and tested a frame with one-piece side-rails, related to an entirely different invention than the one here involved; that appellee has not established that he was diligent in reducing the invention to practice for more than four months after appellant entered the field; and that, therefore, the Board of Appeals erred in awarding priority of invention to appellee.

Counsel for appellee contend, on the other hand, that the building by appellee of the second frame in December, 1932, establishes that appellee was diligent in reducing to practice a frame having one-piece side-rails.

In its decision, the Board of Appeals stated, inter alia:

"While the counts do call for a single piece side frame and appellant first developed a side frame in sections, yet we believe the explanation offered satisfactory that Matthaei's company was not or he thought it was not prepared to build such one piece side frames and that the making and testing of three piece side frames might give knowledge helpful certainly as far as proper cross-sectional shapes, width and weight of metal is concerned. We are not prepared to say that the earlier work from just prior to November 28, 1932 could not be said to be a development of the invention in issue. It is evident from the record that considerable data was collected as to the proper shapes and dimensions for the side frames of an automobile during this early period and perhaps of single piece side frames * * *. Probably this data would have been as useful with one piece side rails as rails formed on welded sections. Furthermore, Matthaei's conception is proven of August 16, 1932 and the record does not disclose a sectional side frame as his goal at any time. Under the circumstances, the examiner's holding is correct.

"In coming to our conclusion, we have investigated the prior art patents to Murray No. 1,723,518 filed May 17, 1923 and Murray No. 1,846,567 filed May 17, 1923, both of which disclose side frames in an automobile chassis of oblong cross-section with two welded seams lengthwise thereof and the patentees teach making such side frame of integral metal strips lengthwise thereof of several sections welded together. The issue counts distinguish primarily in the single welded seam in such hollow sections as far as these elements are concerned. Perhaps Matthaei delayed filing his applications until he tested a single welded seam tubular side frame in view of the prior art patents disclosed to him in August, 1931."

It will be observed that the board stated in its decision that "probably" the "data" obtained by appellee in building and testing a frame having three-piece side-rails (appellee's second frame, built and tested during the critical period) "would have been as useful with one piece side rails."

In view of the fact that the invention defined by the appealed counts is limited to a frame having *one-piece side-rails*, and a method of making it, it was incumbent upon appellee to establish by a preponderance of the evidence that the building and testing of a frame having *three-piece side-rails* amounted to diligence in reducing to practice a frame and a method corresponding to the counts in issue.

Appellee testified that his object in building a frame having three-piece side-rails "irrespective of the method produced, was to gain experience and make comparisons"; that he was "concerned to a great extent with the manner in which the bending longitudinally [to provide arches over the front and rear axles] would take place on the side-rail"; that so far as he knew tubular side-rails had never been bent longitudinally; that he did not anticipate any difficulty in making the side-rails of a single piece because the necessary apparatus could be purchased in "any one of a half a dozen different places"; that it was not entirely correct to say that he built a frame having three-piece side-rails solely because he did not have the requisite equipment in his plant for making them in one piece; and that to build frames with three-piece side-rails, so far as bending the rails longitudinally was concerned, would facilitate "for the time being anyway, long experimental assemblies." When asked on direct examination to state his purpose in making the second frame with three-piece side-rails, he said: "We had felt that we had gained considerable further advice dur-

ing the past several months pertaining to frame design and construction. We likewise felt that the industry was probably a little closer to a type of frame such as we had in mind; and we likewise felt that the reduction in the weight and cost would be more attractive to us as a means of influencing us in the future development of the assembly." He also stated on direct examination that the making of a frame with three-piece side-rails was a departure from his "basic idea as to how the" frame "should be made," and that he and his associates were so "greatly buoyed up" by the experience with the building and testing of the second frame that they *"decided to proceed with the expenditure of further money by producing our next frame with the side-rails in one piece."* (Italics ours.)

It is true, as stated in the decision of the Board of Appeals, that the cross-sectional dimensions of the side-rails used in the second frame were smaller than those used in the first frame which was built and tested by appellee in the fall of 1931. However, neither appellee nor his witnesses testified that they received any information in the building and testing of the second frame having three-piece side-rails that could or did aid them in the building of a frame having one-piece side-rails. Furthermore, although appellee testified that during the period covered by the building of the first and second frames he and his associates had in mind a frame having one-piece side-rails, he, nevertheless, testified that they *decided* to build a frame having one-piece side-rails *after* the tests of the second frame had been completed. It further appears from the record that when appellee and his associates decided to build a frame having one-piece side-rails they had no difficulty in securing the necessary tubular forms for such side-rails, nor did they have any difficulty in building such a frame in their company's plant.

The witness Paquette testified that after the testing of the frame having one-piece side-rails, which testing was completed on April 13, 1933, he was asked to find someone who had a machine capable of bending the side-rails; that he "happened to know that the Epworth Manufacturing Company [located only half a block from appellee's company's plant] had such a machine"; and that the side-rails used in appellee's frames Nos. 4 and 5 (appellee's Exhibits Nos. 13 and 14) were bent in that company's plant. There is nothing in the testimony of the witness to indicate how long prior to April 1933 he had known that the Epworth Manufacturing Company had a machine which could be used for bending the one-piece side-rails.

Neither appellee nor his witnesses, who were employees of appellee's company and apparently in appellee's confidence, gave any explanation as to how the building and testing of a frame having three-piece side-rails might or did contribute to a successful reduction to practice of a frame having one-piece side-rails. Appellee and his witnesses having failed to give such explanation, what is the basis for the inference, which we, in effect, are asked to indulge and upon which the Board of Appeals evidently rested its decision, that the building and testing of a frame having three-piece side-rails amounted to diligence in reducing to practice a frame having one-piece side-rails? We are unable to find any evidence of record upon which such an inference might legitimately rest.

We must hold, therefore, that the activities of appellee (who was the first to conceive but the last to reduce the involved invention to practice) immediately prior to November 28, 1932, the date awarded appellant for conception of the invention, and thereafter until the latter part of March or the first of April, 1933, when for the first time he became actively engaged in the building and testing of a frame (which, as hereinbefore noted, was not satisfactory) conforming to the invention defined in the appealed counts, do not establish diligence in reducing the involved invention to practice, and that the board erred in awarding priority of invention to appellee.

For the reasons stated, the decision of the Board of Appeals is reversed.

Reversed.