**AUSTIN POWDER COMPANY, Plaintiff,**

v.

**ATLAS POWDER COMPANY,
Defendant.**

**Civ. A. No. 80–292.**

United States District Court,
D. Delaware.

May 31, 1983.

Robert K. Beste, Jr., Biggs & Battaglia, Wilmington, Del., Robert V. Vickers, Body, Vickers & Daniels, Cleveland, Ohio, for plaintiff.

Douglas E. Whitney, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Garland P. Andrews, Roy W. Hardin, Richards, Harris & Medlock, Dallas, Tex., for defendant.

## OPINION

STAPLETON, District Judge:

This is a patent infringement action between two manufacturers of explosives and related products. Austin Powder Company ("Austin") has charged Atlas Powder Company ("Atlas") with infringement of the product claims in U.S. Patent No. 4,141,296 (" '296 patent"), now reissued as Re 30,621 (" '621 patent"), and of the method claim in Patent No. 4,133,247 (" '247 patent"). These patents involve non-electric delay blasting devices and techniques. Atlas has counterclaimed asking for a declaratory judgment that all three patents are invalid and unenforceable. This opinion constitutes the Court's findings of fact and conclusions of law following trial on the issues of validity and infringement.[1]

## I. BACKGROUND FACTS

### Explosive Technology Background and Delay Primers

The present suit relates to devices and techniques used in blasting operations conducted in coal strip mining and stone quarries. Rock and ore deposits are fragmented with explosives to permit their removal for use. In these operations the top soil and clay are removed from above the desired formations and a series of boreholes, i.e., long cylindrical columns, is then drilled into the underlying rock. These boreholes are frequently loaded in "decks," i.e. alternating segments of blasting agents and stemming consisting of non-explosive material such as drill cuttings.

The blasting agents in general are not detonable by a blasting cap[2] alone but require an intermediate "booster" or "primer" containing a high explosive such as TNT. The detonation signal in these blasting applications is transferred from the surface to the primers or boosters within the borehole by a downline consisting of a length of detonation cord; the primers, in turn, transfer the signal to the main blasting agents. Early blasting was conducted by exploding all the charges within the borehole simultaneously.

The need for blasting products which would delay the transfer of the signal to the main charges arose as a result of government regulations and the desire to improve safety. The simultaneous detonation of a large number of charged boreholes produces vibration and noise. Governmental regulations directed to reducing the vibration and noise suffered by adjacent property owners led to the practice of exploding a series of delay detonations in each borehole rather than simultaneously detonating all the charges within the borehole. Delayed detonations in the range of milliseconds were found to reduce vibration and noise while maintaining the desired fracturing of rock and earth.

Initially, the necessary precision could only be accomplished by use of electric delay devices. Electric devices, however, were undesirable and in some places prohibited because of their susceptibility to detonation by stray electric impulses from such sources as radios, power transmission lines, lightning and electrical mining equipment. Consequently, the need arose for the development of reliable non-electric delay devices.

Both Austin and Atlas have patents which involve non-electric delay devices to be used in decking operations. Austin's '296 and '621 patents are product patents for a non-electric delay primer device,

---

1. The issues of fraud and damages have been severed.

2. A blasting cap is a metallic capsule containing an initiating explosive and a base charge which is open at the upper end to accept a section of safety fuse.

tradenamed "Austin Delay Primer" ("ADP"), and its '247 patent is a patent on a method of decking. Atlas's patents No. 4,060,033 and No. 4,060,034 (" '033" or "Postupack" and " '034" or "Bowman") are patents on non-electric delay primer devices,[3] as is its patent on its "Deckmaster" device, patent No. 4,295,424 (" '424 patent").

The Atlas and Austin patents purport to teach a device which will achieve a series of delayed detonations in a single borehole while utilizing a single downline. Each of the devices described in the product patents seeks to accomplish this objective by providing some means for:

(1) preventing detonation of or damage to the primer charge directly from the explosion of the downline;

(2) positioning a time delay element which is constructed so that detonation of the primer charge will only occur after the delay period; and

(3) enabling the primer assembly to slide on the downline.

## II. VALIDITY OF THE '296 PATENT

### A. *Anticipation*

1. 35 U.S.C. § 102(g).

Atlas contends that the '296 patent is invalid under 35 U.S.C. § 102(g) because Atlas was the first to conceive the invention and reduce it to practice and did not thereafter abandon, suppress, or conceal it.[4] Atlas claims to have reduced to practice Austin's invention as early as 1974, a date well before Austin's filing date of November 11, 1976 and Austin's alleged reduction to practice date of March 4, 1976.

In early 1973, David Borg and Constantine Postupack, technical sales representatives at Atlas, recognized the commercial possibilities for a non-electric slidable delay primer and they came up with the idea of using a "cast primer"[5] which would incorporate a non-electric delay capsule inside and which would be initiated by means of a downline of detonating cord. The components were to be manufactured separately and assembled on the shot, i.e., at the actual blasting site.[6] They presented their idea to the Director of Sales who had them present the concept to the staff of Atlas's research group. Borg and Postupack were field personnel and they did not feel they personally had the expertise necessary to implement the idea.[7]

The work necessary to develop the idea was initially allocated between two Atlas laboratories. The Chemical Development Laboratory was given responsibility for "working on a suitable booster design." This included responsibility for determining what amount of shielding of the booster was necessary to prevent initiation of the booster directly by the downline and for testing the booster/insert assemblies for proper transfer of the detonation from the downline to the delay insert. The Blasting Supplies Development Laboratory ("B.S. Development Lab") was given responsibility for developing the delay insert to be used with the system. DX–6.

Initial development work in late 1973 indicated that construction of the delay primer "would present certain difficulties which were not easy to overcome". DX–7, p. 1. These difficulties included the difficulty in

---

**3.** The '033 patent patents the device and the '034 patents a type of delay unit.

**4.** 35 U.S.C. § 102(g) provides:

A person shall be entitled to a patent unless—

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to

conceive and last to reduce to practice, from a time prior to conception by the other.

**5.** A cast primer is a primer containing extruded or pressed solid high explosive material as opposed to granular or liquid material.

**6.** They made a primitive drawing of the concept at the time. DX–3.

**7.** Borg 1569. Citations in the form of a name followed by a number refer to the named person's testimony at the numbered page of the transcript.

protecting the cast primer from damage by both the downline and the delayed detonation "transfer system" used to transfer the detonation from the downline to the primer and the difficulty in achieving functioning reliability of this transfer system. The overall design as it was then envisioned called for a short "pigtail" of "Primaline"[8] detonating cord to be laid parallel to the downline detonating cord inside a tube attached to the side of the cast booster. Detonation of the downline would initiate the Primaline pigtail in the tunnel, which in turn would initiate a delay element, and after the desired delay time, a blasting cap inserted into the primer and, finally, the primer itself. DX–7.

As of January 1974, it was recognized that "the successful development of the non-electric delay cast primer will require suitable solutions" to three major problems:

1. Protection of the cast primer from damage by the detonating cord downline before the burning of the delay element in the detonator,

2. Reliable initiation of the delay element from the downline while still permitting easy sliding of the primer into the hole,

3. Development of suitable delay detonators.

DX–6.

In an effort to solve the problem of protection of the primer, experiments were carried out in January 1974, by placing a heavy paper cartridge around the primer, and by passing the E-cord downline[9] through a tube of sufficient wall thickness taped to the outside of the primer. It was

concluded that "protection of the cast primer can be achieved." DX–6.

With respect to the problem of reliability, after testing, the Chemical Development Laboratory concluded that a Primaline pigtail on the end of the insert would not reliably initiate from the E-cord downline. DX–6, p. 62. A number of alternate techniques were considered including the substitution of "Detacord"[10] for Primaline and the use of a sensor which would be initiated by the downline which would then initiate the Primaline. DX–6, p. 62.

Testing was begun on a "PETN booster" sensor, but the laboratory's tests did not produce a sensor which would reliably initiate the Primaline and it was decided to try an arrangement with the PETN booster perpendicular to the E-cord, rather than parallel. The laboratory did conclude, however, that it could construct a suitable delay insert for the primer or output end of the delay unit. DX–6.

In February and March 1974, work continued on testing various sensors with different thicknesses for the sensor's aluminum capsule and with different types of explosives inside the capsule. The need for an "air gap" between the downline and the sensor in order for the cast booster to slide freely down the downline was recognized at that time, and work was begun to test sensors for reliable initiation where the sensor was not in contact with the downline.[11] DX–8.

In March 1974, the laboratory first tested a cast primer actually assembled together with a delay unit as depicted in Figure 1:

---

**8.** Primaline is the tradename for one type of detonating cord.

**9.** E-cord is a 25 grain detonating cord made by the Ensign-Bickford Company. The number of grains indicates explosive strength.

**10.** Detacord is a type of detonating cord more sensitive than Primaline.

**11.** Maximum gaps were determined to be on the order of .15 inch, depending on the type of sensor.

Figure 1

These assemblies were constructed by taping a piece of polyethylene foam to the side of a cylindrically shaped cast primer. The foam "barrier" ran the length of the primer, was about an inch wide and had a square cross section. There was a tunnel for the E-cord downline running lengthwise through the middle of the foam. The delay unit used consisted of a sensor, a 2″ length of Primaline and a delay blasting cap. The delay blasting cap was inserted into the cast primer and the sensor end was inserted into a hole or slot bored in the foam barrier horizontally to the cord tunnel. DX–100, DX–101; DX–9, p. 54. The assemblies were covered with cinders and fired at the laboratory. The delay periods operated as expected as measured by an electronic counter. Nevertheless, the laboratory indicated that improvements in the "overall design" of the system were needed. DX–9, p. 53.

Although the Chemical Laboratory apparently did no work on the project in the following months, the B.S. Development Laboratory continued work on the delay unit which included developing chemicals and physical arrangements to produce various delay times, particularly a 12 millisecond delay, and on the use of a rigid "L" shaped delay insert having a sensor at one end and a delay cap on the other and containing Primaline within the "L" shaped conduit. DX–16, DX–17, DX–18. In August 1974, the Chemical Lab once again fired above ground cast booster assemblies similar to the ones fired in March 1974, except using the then current version of the delay element. A "continuous velocity probe" indicated that the delay primers exploded with the proper delay times. DX–19.

In December of 1974, and January and February of 1975, more electronic laboratory tests were conducted on the delay inserts (DX–22) and field test procedures were carried out at Winton Coal Company, No. 11 Hill, to evaluate the inserts under field conditions and to evaluate instrumentation used to monitor the delay times of the individual decks containing the delay assemblies. Several boreholes were loaded in three or four decks with booster assemblies like those used in March 1974. "Some difficulty was encountered" in sliding the assemblies down the downline, "particularly when mud was present on the cord." DX–25. Consequently the foam "barrier" was modified so that a rigid paper tube was placed in the tunnel. The Atlas personnel had some trouble with the instrumentation for measuring the delays and used various types of instruments including the seismic jug, pressure transducer, continuous velocity probe, and ionization probes with electronic counters. In each of the borehole tests, however, they were able to measure at least one or more delay times for the delay assemblies.

In March of 1975, another field trial of the assembly was run at Bethlehem Steel's Greenwood Stripping Operation in order "to develop some reliability data on the func-

tioning of the delay insert." DX–28. The assemblies were similar to those used in the March 1974 testing at the Winton Coal Company in that they used a foam structure for receiving the downline taped to the side; but this time the foam was cut level with the top of the booster and a wooden cap was glued on the top. DX–111. The wooden cap contained a slot for the delay insert through which the downline also passed before passing through the foam tunnel. The purpose of the wooden cap was to try (1) to hold the initiator of the insert, i.e. the sensor end, in close proximity to the E-cord, and (2) to protect the initiator from damage when the assembly was loaded in the borehole. DX–30. There was some trouble sliding the booster down the line and it was observed that the wooden cap was no longer in proper position. As a result of this field test, the Atlas Personnel reached the conclusion that "the physical construction of the delay insert/cast booster assembly has to be changed in order to have a sturdy assembly which will withstand loading in the field" and announced the laboratory's work plan to "develop a sturdy construction for the delay insert/cast booster assembly which can be used in another field trial."[12] DX–30.

During the remainder of 1975, and the early part of 1976, Atlas personnel directed the majority of their efforts on the project to experimenting with the structure of the delay insert. For example, it was determined that a Nonel tube, an empty tube having a light coating of explosive dust on the inside, could be used in place of Primaline as a signal transmitter between the sensor and delay cap of the delay insert. No more work was apparently done on the physical construction of the assembled device in order to achieve the sturdy assembly which the March 1975 lab report had called for and no more field trials were made.

Then, in about March 1976, a corporate decision was made to try to use a "Kine-

pak" bottle instead of a cast primer in a delay primer. The reason for this was that Atlas had newly acquired the company which manufactured the Kinepak bottle. The bottle was made of plastic, had a screw-on top, and contained explosive in granular form. From then on through May of 1977, the laboratory's efforts were almost entirely directed to work on the delay insert and the development of a delay booster using the Kinepak bottle.

After numerous problems with the functioning of the Kinepak version especially under wet conditions, the laboratory decided in May 1977 to "reinitiate" work on developing a cast version. DX–67. Mr. Slawinski made a several month effort to adapt the foam version to a commercial product using some type of paper container. Bowman 2108. After those efforts failed, Don Smith[13] started mocking up ideas for a plastic package design including one with a diamond-shaped cross section. DX–107. It was not until January 1978 that a drawing was ready to be submitted to a moldmaker and not until June 1978 that a molded plastic version was actually ready to be tested. PX–575.

In addition, during the period after May 1977, tests were performed to determine if the sensor would reliably initiate if partially obstructed, more tests were undertaken to determine the maximum allowable gap between the downline and the current version of the sensor,[14] a locking device to hold the insert in the primer was developed to prevent the insert from springing out of the primer when the downline initiated, and testing was done on a straight insert, as opposed to the L-shaped version. The position of the primer end of the delay element was also moved from the middle of the primer to the outer edge in order to minimize shock from the downline to the delay insert. Finally, after developing a straight insert, and after further testing and experi-

---

12. This arrangement with a wooden cap was never used again in a borehole. Bowman 1973.

13. Mr. Slawinski and Don Smith worked in the Atlas laboratory.

14. A permissible gap was determined to be less than one quarter inch.

mentation, Atlas came out with a commercial product sometime after April 1979. This product is the accused device, the Atlas Deckmaster. See Figure 2.

Figure 2

■ Atlas asserts that its March 1974 laboratory and subsequent borehole firings using a device, like Figure 1 above, with foam taped to the side were an actual reduction to practice of the invention of the '296 patent by Atlas. Actual reduction to practice occurs when the inventor constructs a device that is within the scope of the patent claims and demonstrates its effi-

cacy to achieve the purpose for which it was designed. *Radio Corp. of America v. Int'l Standard Electric Corp.,* 232 F.2d 726, 730 (3d Cir.1956). The inventor's efforts need not have reached a form which is commercially marketable, but they must have passed beyond a mere hope of future achievement of the intended purpose. Although a defect in the device due to crude workmanship does not necessarily preclude the device from being a reduction to practice, the defect must not be due to some fundamental fault in the device's construction. *McKenzie v. Cummings,* 24 App.D.C. 137, 1904 C.D. 683 (1904). Any defect and its cure must, at least, be obvious to one with ordinary skill in the art. *Howard v. Bowes,* 31 App.D.C. 619, 1908 C.D. 547 (1908).

■ I conclude that Atlas has failed to establish an actual reduction to practice prior to November 11, 1976, because it has failed to establish that it had completely constructed a non-electric delay primer with demonstrated efficacy for achieving its intended purpose. A critical element in the achievement of the delay primer's purpose is functioning reliability. As the testimony indicated, because of the obvious dangers presented when explosives remain unexploded in a borehole after a detonation attempt, it is essential that the delay unit reliably initiate so that the primer does not remain unexploded in the borehole.[15] Atlas in fact recognized as early as January 1974 that a solution to the problem of reliability was necessary in order to have a suitable device. Further, in order to have a functioning device, it is also necessary that the device always slide down the downline. As was also recognized by Atlas as early as 1974, it was the simultaneous solution to these two constraints which posed the greatest problem because the solution to the one worked against the solution to the other. With Atlas's delay unit, in order to guarantee slidability, it was necessary to have enough air space between the down-

---

**15.** The hazard inherent in an unexploded charge in a borehole makes it necessary to manually dig the charge out. This is a time consuming and expensive activity which is itself hazardous.

line and the initiator or sensor end of the delay element, but it was also necessary that such a space be minimal, under .25 inch, in order for the delay element to reliably initiate.[16] In fact, hundreds of tests over several years were performed to test various kinds of sensors for their gap sensitivity.

The foam versions of the assembly which were constructed and tested prior to November 1976 did not represent a solution to the problem. Statements from Atlas's own laboratory reports at the time indicate that no solution had been found. For example, after the March 1974 firings using a foam device like Figure 1, the laboratory stated that improvements in the "overall design of the system" were needed. It is evident from the March 1975 laboratory report that the design flaw in the foam device which needed improvement was the lack of reliable detonation of the delay initiator caused by the inability of the foam to hold reliably the initiator of the delay element in close proximity to the downline and the foam's inability to protect the initiator from damage when the assembly was loaded in a borehole.[17] An attempt was made to solve these problems by adding a wooden cap, but this was ineffective and the laboratory concluded it needed "to develop a sturdy construction." No more work was done to change the structure of the cast booster assembly, however, until 1977.

The fact that Atlas took such a long time from its first firing of March 1974 until it actually had a commercial cast primer product sometime after April of 1979, even taking into account the time period when the laboratory's efforts were directed to developing the Kinepak version, is also suggestive of the fact that the device was not yet practically useful in November of 1976. Given that Atlas had seen the commercial possibilities for such a device by 1973 and by 1976 was already behind its competition in actually marketing a device,[18] if the foam device had been practically useful Atlas would certainly have been able to enter the market with greater speed.

Although, as Atlas points out, it did perform an impressive number of tests during the relevant time period, the primary aim of these tests was to test the operation of the delay insert, not the makeshift structure that was holding the component parts together. For example, as one of the Atlas workers testified, the "successful" March 1974 test "was a functioning test to test the delay elements that were supplied [by the Blasting Supplies Development Laboratory.]"[19] Similarly, the purpose of the early 1975 borehole tests, as evidenced by the "Task Objective" of the January and February laboratory reports, was "to run a series of borehole tests on delay insert/cast booster assemblies to develop some reliability data on the functioning of the delay insert." PX–575. Further, incidental to testing the inserts, Atlas actually demonstrated that its makeshift structure was *not* functioning reliably and, consequently, was in need of further development work.[20]

All these tests demonstrated, therefore, was that Atlas had solutions to two of its three problems, namely, protection of the primer and a suitable delay unit that would delay with the proper time. Thus, the most that can be concluded from these tests is

---

16. A further constraint was that the components of the delay primer had to be assembled on the shot in order to meet certain requirements for interstate shipping of explosives. This meant that the structure's method of fixing the proper relationships had to be such that when assembled by field personnel the method would work reliably.

17. A related aspect of the flaw was that, with the foam device, achieving the correct gap was solely accomplished by the human assembler. Thus, an inherent problem was that field personnel would not necessarily initially insert the sensor with the precise .25 inch or less gap required even if the foam could maintain that gap.

18. Austin was already in the market in 1976.

19. Frantz 2186.

20. After the March 1975 borehole tests, the "Task Objective" then became "to run borehole tests on delay insert/cast booster assemblies under field conditions to develop data on the proper construction of the assembly." March 1975 Laboratory Report, PX–575.

that if Atlas were able to develop a "sturdy" construction which would reliably hold the sensor of its delay unit within detonation distance of the downline while still allowing for slidability, such a construction would in fact detonate with the proper delay time. In other words, all Atlas had as of November 11, 1976 was a mere hope of future achievement.

Atlas also suggests that, even if the foam device was in fact inoperative, nevertheless, there was an actual reduction to practice before November 1976 because the steps necessary to render the device operative were obvious to one skilled in the art. I cannot so conclude, however. The fact that Atlas took a substantial length of time to develop an operative device after it recognized the foam device's reliability problem and even after there was a corporate "push" in 1977 to meet the competition is indicative of the scope of the difficulties that remained in achieving an operative device. Further, not only did it take a long time, but major design changes were needed. The foam device relied on the principle of "friction fit" to hold the L-shaped insert, as well as the earlier version of the insert in DX–101, in position relative to the downline, but Atlas was never able to make this method work reliably because of the flimsiness of the foam. But, when Atlas changed to the sturdy plastic or plexiglas of later versions, these sturdier materials could not hold the insert by friction fit. Consequently, Atlas had to develop a new straight insert with springlike qualities and alter the design of the device at the point where it holds the input end of the delay unit in order to incorporate a principle of springlike action for holding the new insert. Thus, the final device relied on a springlike action, as opposed to friction fit, to reliably hold the insert in proper position with respect to the downline.[21]

For the foregoing reasons, I conclude that Atlas did not reduce to practice before November 11, 1976, the filing date of Austin's '296 patent, and, accordingly, that Atlas did not anticipate the Austin invention under Section 102(g).

### 2. 35 U.S.C. § 102(a).

■ In a related argument, Atlas maintains that it anticipated the Austin invention under 35 U.S.C. 102(a) because of the prior work on its devices.[22] Since Atlas had not conceived or made a workable device as of November 1976, it is clear that the Austin invention was not "known or used by others in this country" by Atlas before Austin's invention date. Accordingly, there is no anticipation under Section 102(a).

### 3. 35 U.S.C. § 102(e).

Atlas also contends that Austin's product patents are invalid under 35 U.S.C. § 102(e) because the Postupack '033 patent describes

---

21. Atlas has contended *arguendo,* that even if it did not reduce to practice prior to November 11, 1976, it anticipated Austin's invention because it was first to conceive and was diligent in reducing to practice. Conception occurs when the inventor has and discloses a complete idea for a product. *Standard Oil Co. v. Montedison,* 494 F.Supp. 370, 407 (D.Del.1980), *aff'd* 664 F.2d 356 (3d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982). The idea must be of a specific means, not just a desirable end or result. Chisum, *Patents,* Vol. 3, § 10.04 at 10–45 (1982). The idea must be sufficiently complete so that what remains to reduce it to practice, including testing or experimentation, may be done by anyone with ordinary skill in the art. *Mergenthaler v. Scudder,* 11 App.D.C. 264, 1897 C.D. 724 (D.C.Cir.1897); Chisum at 10–63.

In this case, it is clear that, although Atlas had the idea for the desired end as early as 1973, it did not have an idea for the means to construct a device which would function for its intended purpose prior to November 11, 1976. Further, even if Atlas had shown that it had conceived the invention as of March 1974, it was not diligent in reducing to practice given that it abandoned its efforts to develop a cast primer device for over a year in order to work on the Kinepak bottle device. *See Riemenschneider v. Matthaei,* 103 F.2d 366, 372 (Cust. & Pat.App.1939).

22. 35 U.S.C. § 102(a) provides:

A person shall be entitled to a patent unless —(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent.

the invention and its filing date of March 9, 1976 preceded a reduction to practice by Austin.[23] Austin contends, however, that it reduced to practice on March 4, 1976.

In the early 1970's, personnel at Austin had recognized the commercial possibilities for a non-electric delay primer. In early 1974, Donald Lyons, a field technical representative at the Madisonville, Kentucky plant, made an actual model, PX-49, of a product that would be loaded on a single downline and would provide multiple delays in a borehole. This model used a piece of cardboard taped to the side of a dummy primer with three separate tubes attached to the cardboard. The purpose of the cardboard was to simulate a "standoff" to keep the detonating cord downline from prematurely detonating the primer. Lyons 710. One of the tubes was to allow the unit to slide on the downline. The other two tubes were used to affix two standard MS connectors that would delay the detonation of the primer a set time after detonation of the downline. An MS connector is a "double-pigtailed" delay element sold as a standard commercial product by Austin at that time.[24]

In 1975, Lyons showed this prototype to Brooke Calder who made four or five plastic cutouts like the bracket device depicted in the drawing of PX-50. This device was ruled out, however, because they decided it would not withstand the impact of heavy bags of explosives dropped on it. Lyons 711. The bracket design was modified by Ronald Ermert who made a drawing and prototype of another U-shaped bracket device.[25] PX-112. Then, in late 1975 and early 1976, David Childs, newly assigned to the position of product manager for cord products and cast primers, reviewed the work that had been done thus far and began going to the plant together with James Rishel, a project manager, to make and test plastic models in the form of U-shaped brackets. They tested various kinds of plastics, glues and tapes.

When Childs had a product he was satisfied with, he and Rishel made numerous samples and tested them under simulated field conditions during the period from March 4 through March 8, 1976 at Austin's Red Diamond plant. The plastic for the frames of these samples was one-quarter inch thick low-density polyethylene. Each U-shaped frame had a hollow tube along one side for the downline and hollow tubes along the top and the other side for the delay unit which consisted of an MS connector. The input end of the delay unit was looped around the downline and threaded back through the hollow tube along the top. The output end of the delay unit was inserted into the primer. See Figure 3.

23. 35 U.S.C. § 102(e) provides:
 A person shall be entitled to a patent unless—
 (e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent.

24. More specifically, it consists of a delay element with a length of detonating cord extending from each end.

25. Ronald Ermert was not employed by Austin.

**Figure 3**

In the simulated field tests, the devices were tested by drop tests and sliding tests and were covered and fired. They were also tested by firing without the primer end

of the MS connector inserted into the primer. The purpose of this last test was to make sure that neither the downline nor the MS connector were damaging the primer and to determine whether the MS connector properly detonated in the shape into which it had been contoured.[26] Rishel 920–21. These tests were successful.

On March 26, 1976, Childs used the frame and a 60 grain pigtail arrangement in a borehole shot at Cherokee with A-cord downline.[27] It was later discovered that 60 grain pigtail could directly set off Dow 33 slurry, one type of main charge frequently used in decking, and that 40 grain pigtail could set off certain types of ANFO, another type of main explosive charge. PX–161, 162, PX–172, Childs 561–2. Because of this, Austin decided to reduce the cord size of the pigtails to 30 grain and there was a demonstrated reduction in vibration with this arrangement at Colonial Mine in May of 1976. PX–164. This arrangement was used at numerous commercial sites in May 1976 with a measured reduction in vibration in each instance. PX–164. Thereafter, Austin continued to use its device at numerous commercial field sites with success. In fact, as of July 1976, 2,000 units had already been successfully used in the field. PX–165.

By August of 1976, the ADP bracket device was modified to the molded configuration of PX–59. Calder 883. The full production model is shown by PX–44 and 45. See Figure 4.

**26.** There was testimony that if an MS connector is bent in a 90° angle, a detonation wave will not carry past the bend. Thus, it was necessary to be sure that the contoured shape of the connector would not interfere with the detonation wave.

**27.** The pigtails of the MS connectors came in different grains or explosives strength—the greater the number of grains, the greater the explosive strength.

A-cord is a 30 grain detonating cord made by Austin.

**Figure 4**

I conclude from this evidence that as of March 4, 1976, Austin had constructed a U-shaped bracket device as claimed in the '296 patent. Although this device was operable at that time, a complete demonstration under all field conditions of its efficacy for achieving its intended purpose was not made until the Colonial Mine shot in May 1976, when machines actually measured a reduction in vibration when the devices used 30 grain MS connectors. This test demonstrated that the pigtail portion of the delay element was not detonating the main explosive charge directly.

 Unless a device is "so simple and of such obvious efficacy that the complete construction of one of a size and form intended

for and capable of practical use" is sufficient to demonstrate its utility, in order to achieve actual reduction to practice an inventor must test the device to establish its capacity to perform successfully its intended purpose. *Sydeman v. Thoma,* 32 App. D.C. 362, 1909 C.D. 340 (1909). Although the required testing need not necessarily be under conditions of actual use, the test must be such as to show that the invention will work as intended in its contemplated setting. *Eastern Rotorcraft Corp. v. United States,* 384 F.2d 429, 181 Ct.Cl. 299 (1967).

A demonstration of the Austin device was not completed until May 1976 when the device was actually tested in a borehole and it functioned properly. While it may not be necessary for a demonstration of a delay primer's effectiveness to be tested in the field, it must at least have been demonstrated to be successful under simulated field conditions. In this case, although several conditions had been tested, until May 1976 there was no demonstration of the device's ability to avoid premature detonation of the borehole's main explosive charge by the pigtails of the delay element while still achieving initiation of the delay element itself. Accordingly, Austin did not reduce to practice until that time.

The '033 patent does not anticipate the Austin invention under Section 102(e), however, if Austin conceived the inventive idea prior to the March 9, 1976 filing date of the '033 patent and proceeded with due diligence to a reduction to practice. *See Honeywell, Inc. v. Diamond,* 499 F.Supp. 924, 928 (D.D.C.1980). Austin clearly conceived its invention prior to March 9, 1976, since as of that time not only had it made the embodiment which it would in fact reduce to practice, but it had already done most of the testing. The only remaining testing was the borehole testing to determine the strength of the pigtails and this was completed in May of 1976, a time lag of less than three months. Thus, even though Austin did not reduce its invention to practice as of March 9, it had conceived its invention and was certainly diligent in re-

ducing to practice by completing the testing a short time thereafter.

Further, in order to anticipate, a patent must describe the invention. The description must be sufficient to enable one with ordinary skill in the art to make the invention alleged to be anticipated. Chisum, Vol. 1, § 3.04[1]; *General Electric Co. v. DeForest Radio Co.,* 17 F.2d 90, 100 (D.Del.1927), *aff'd in part and rev'd on other grounds,* 28 F.2d 641, *cert. denied,* 278 U.S. 656, 49 S.Ct. 180, 73 L.Ed. 565 (1929). This requires that all elements of the invention be taught by the single reference or be obvious to one skilled in the art. In the present case, the '033 patent does not teach a structure for maintaining the position of the delay unit so that it will reliably initiate from the downline. Since the Atlas personnel themselves, who were certainly skilled in the art, were never able to make an operative device based on the disclosure of their '033 patent, I cannot conclude that this omitted element was obvious. Accordingly, the '033 patent does not describe or teach the Austin invention and does not anticipate the Austin invention under Section 102(e).

**B.** *Obviousness*

Atlas contends that the invention of the Austin product patents is obvious and therefore invalid under 35 U.S.C. § 103. An invention is obvious "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. The burden of persuasion is on Atlas to show that the Austin invention is obvious. 35 U.S.C. § 282; *Universal Athletic Sales Co. v. American Gym,* 546 F.2d 530, 540 n. 28 (3d Cir.1976), *cert. denied,* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977).

To evaluate a claim of obviousness, the Court must determine the level of ordinary skill in the pertinent art, the scope and content of the prior art and the differences between the prior art and the claims at issue. *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 545 (1966); *General Battery Corp. v. Gould, Inc.,* 545 F.Supp. 731, 746 (D.Del.1982). As circumstantial evidence relevant to the issue of obviousness, the Court may consider such factors as commercial success, long felt but unsolved need, and the failure of others. *Id.*

It is the "hypothetical worker in the industry who is attempting to solve the problems the inventor addressed by means of the patented device" who determines the level of ordinary skill in the art. *General Battery* at 750. In the pertinent art of explosive devices, such a hypothetical worker would have substantial practical experience in dealing with explosives and explosive devices. In terms of formal education, the typical worker would have a college education in science or engineering.[28]

The prior art includes a number of patents disclosing devices for delay primers. The Driscoll patent, No. 3,709,149, teaches slidability and protection of the primer from the action of the downline (Roth 2562) although it does not show the use of an elongated delay unit similar to those in the Austin and Atlas devices. The Turnbull patent, No. 3,713,384, teaches slidability and sequential loading of the borehole. Roth 2563. It also teaches the use of different kinds of shock absorbing materials.[29]

Atlas contends that it has introduced evidence which satisfies its burden on the issue of whether these patents render Austin's invention obvious. Atlas's expert, Dr. Julius Roth, testified that, in combination, these patents make what is covered by the patent in suit obvious to a person of ordinary skill in the art at the time the inven-

---

**28.** A college degree is not necessary, however. Many individuals operate successfully as problem solvers in the art relying solely on practical experience.

**29.** All three of these references were cited to the examiner.

tion was made. I am not convinced, however. Dr. Roth did not attempt to explain or demonstrate to the Court how it was that these ideas could be combined in an obvious manner to make a package which would hold the primer, downline, and delay element in proper relationship while still permitting sliding. The only patent which he suggested taught the use of such a package was Kern, but Kern did not solve the problem of how to use a delay element unattached to the downline, and hence, how to permit sliding.[30] While Turnbull showed the end of a pigtail in "slidable contact" with the downline and according to Dr. Roth could be used with an MS connector, he did not suggest that it taught how to use a package or structure for holding the proper relationships. Further, Dr. Roth did not attempt to explain how to modify Kern so as to use a pigtail arrangement like that of Turnbull and reliably maintain the proper relationships. Given that Atlas's own personnel specifically rejected the use of a pigtail arrangement in combination with a structure similar to Kern, such a modification cannot have been obvious.[31]

Atlas also suggests that its own early development work is prior art under Section 103 which, when combined with the other prior art patents, makes Austin's invention obvious. Atlas's work, however, does not augment the teachings of Driscoll, Kern, and Turnbull in any way relevant to the Austin invention. As noted earlier, the Atlas development work, for example DX-101,

did not aid in the solution of the problem left open by those patents, namely, the problem of how to use a structure to hold reliably the proper relationships of downline to delay unit while still permitting both sliding and detonation of the delay unit.[32]

Finally, the secondary evidence in this case provides substantial affirmative support for a conclusion of non-obviousness. As discussed above, the Atlas lab personnel, who certainly had at least ordinary level of skill in the pertinent art and who perceived the need for the invention in 1973, were unable to make an operable device for over six years after that. This was in spite of a long felt commercial need for the invention, a push from their own management to meet the competition which was already selling devices in 1976 (PX–173–180) and the devotion of extensive efforts by many individuals.

Accordingly, I conclude that the '296 patent is not obvious.

## III. INFRINGEMENT OF THE PRODUCT PATENTS

### A. *Literal Infringement*

■ Austin contends that the Deckmaster, *see* Fig. 2, *supra,* literally infringes numerous claims of the '296 patent and the '621 reissue patent, specifically, claims 5, 18, and 23, of each patent and claims 25 and 27 of the '621 patent.[33] There is a dispute as to whether several phrases in the

---

**30.** Dr. Roth testified that Kern teaches slidability because there is a cord tunnel on the side of the primer. James Rishel, a project manager at Austin and a person with ordinary level of skill in the pertinent art, testified, however, that it did not teach slidability. Kern does not teach the use of the primer to slide down a downline or the use of multiple primers since in Kern the bottom end of the downline is shown to be affixed to both the end of the primer and the delay element.

**31.** *See* DX–6 and 7. Dr. Roth also did not testify that anything in Driscoll would aid in this, presumably because Driscoll used a delay unit wholly unlike Austin's or Atlas's.

**32.** Since the Atlas patents, as found above, were not filed prior to Austin's date of inven-

tion, these cannot be considered as prior art references under Section 103. But, in any case, the disclosures and claims of those patents also add nothing further to the solution of the fundamental problem for the same reason that the early work does not.

**33.** Claims 5, 18, and 23 of the '621 reissue are the same as in the '296.

Claims 7, 20, and 24 of the '296 and '621 patents and claim 26 of the '621 patent are also allegedly infringed. These need not be considered separately, however, because they are dependent on the other cited claims and there is no dispute about the meaning of their additional language.

cited claims apply to the Deckmaster.[34] Claim 18 is a representative claim:

A device for detonating an explosive material in a borehole with a detonating cord down line extending into said borehole, said device comprising: an explosive element capable of detonating said explosive material upon being detonated, an elongated detonation time delay unit formed into a curved shape between an input portion and an output portion, said unit having an intermediate time delay means for delaying detonation between said input portion and said output portion a selected amount of time; supporting means exterior of said primer for slidably supporting said input portion in detonation contact transfer relationship with said down line whereby said time delay unit can slide along said down line; means for holding said output portion in detonation relationship with said explosive element; and means for preventing detonation of said element directly by detonation of said down line.

The first matter in dispute is the terminology used to denote the relationship between the downline and the input portion of the delay element. In particular, claim 5 speaks of "detonation contact," and claim 18 of "detonation contact transfer relationship." Atlas's position is that this terminology requires physical contact and so does not apply to the accused device which employs a "gap" relationship. Austin construes the language to permit but not require physical contact because it maintains that "contact" includes both touching and not touching.

The word "contact" in these phrases appeared by way of an amendment in response to a rejection of the claims on the ground that they were anticipated by Bowman and Postupack. In its accompanying discussion of these amendments, Austin indicated that, as amended, the language of

the claims called for touching, something which was said to be an improvement over Bowman and Postupack which could not operate with touching. Austin pointed out that Bowman and Postupack would not function with physical contact between the downline and the delay unit because friction with its highly sensitive sensor could result in premature detonation of the sensor.[35] Austin stressed that this requirement of a gap introduced manufacturing and field assembly difficulties. In contrast, because Austin used an inlet cord in its delay unit which could contact the downline, its device was said to be superior. The amendments to the claims were obviously intended to reflect this distinction. Thus, for example, in amending present claim 18, "detonation transfer relationship" was changed to "detonation contact transfer relationship" in order "to recite the structure to maintain contact with the detonating cord, which concept is not illustrated in [Bowman and Postupack]."[36] Accordingly, I conclude that contact means physical contact, a construction which Austin clearly intended and which comports with common usage. Since the accused Deckmaster has a space between the input portion of the delay unit and the downline, it does not literally infringe those claims which use the term "contact."

The proper construction and application of the language of several other elements of the claims is also in dispute. Claim 23 speaks of an elongated delay unit formed into a "selected contoured shape" and a "guideway matching said selected contoured path." It thus contemplates a guideway having the same contoured configuration as that of the delay unit. The Deckmaster has no such guideway matching the delay unit's path.

In claims 5 and 27, the delay unit is described as having a "generally linear

---

**34.** It is clear that except for these disputed phrases, the claims read on the Deckmaster.

**35.** *See, e.g.,* Column 6, line 17 of Bowman: Premature actuation of the sensor is prevented by avoiding frictional contact between the

sensor and the detonating cord downline or upline.

**36.** File Wrapper of '296 patent, Austin's Response to the March 30, 1978 office action. DX–165.

path." Atlas construes this as meaning the path of the unit must be in a straight line. Linear, according to Webster's Third International Dictionary, means "of or relating to a line" and one of the meanings of line is "a locus of points whose coordinates depend on a single independent variable: Curve." Thus, the word "linear" encompasses the concept of a curved line as well as a straight line. From the fact that the delay elements shown in the drawings, with only one exception, have curved paths, it is clear that linear is being used in its dictionary sense in these claims.[37] The Deckmaster device does use its delay element in such a path.

The term "carrier" is used in many of the claims and Atlas suggests that the meaning of the term is unclear. For example, claim 27 reads, "A carrier for supporting a primer and for guiding said primer along a detonating cord extending into a borehole ..." It is evident from its usage in context throughout the entire patent, however, that carrier means the external package of the primer explosive device. The Deckmaster has such a "carrier."

Atlas further objects to the application of the carrier language to its device on the basis that its carrier does not "support" the delay unit as those claims require.[38] Rather the delay element in its device is said to be supported by the explosive primer material itself. From an examination of the figures in the '296 and '621 patents, however, it is clear that "support" does not require that the package entirely support the delay element without aid of the primer material since, in all of the figures, the primer material provides some direct support for the delay element. It is clear from an inspection of the Deckmaster device that under this interpretation the Deckmaster supports the delay element.

Claim 27 claims a device where the carrier includes "positional control means external of said primer for holding said input portion [of the delay unit] in a predetermined relationship with respect to said detonating cord as said carrier slides along said detonating cord." Atlas points out that its delay insert is held in proper position by a springing action requiring the interaction of the primer material itself, the delay element, and the package. Therefore, Atlas argues that the carrier does not include a positional control means for the delay element as described in claim 27. I find, however, that the portion of the accused device which holds the input end does provide positional control of the delay element.[39]

Finally, claim 25 claims a device with "an explosive element capable of detonating [the borehole explosive material], an elongated detonation time delay unit formed into a selected contoured shape ...; means for securing [the] output end [of the delay unit] in detonation relationship with said explosive element; ... a positional controlling structure ... including a means for holding said element in said selected contoured shape..." Atlas suggests that since "said element" is the explosive material, its device does not infringe because the explosive material in its device is not held in a contoured shape. It is evident, however, that this was a slip and that "delay unit" was intended rather than "element" since it is the delay unit which is formed into a contoured shape. I think it clear that an artisan of ordinary skill in the art would read Claim 25 to require a contoured delay unit rather than contoured explosive material. Since Atlas's delay unit is held in a selected contoured shape, its Deckmaster device literally infringes this claim.

Based on the foregoing, I conclude that the accused device literally infringes claims

37. *See also,* Col. 5, line 49, '296 patent, where the delay element of Fig. 1 which is shown to be curved is described as "linear."

38. For example, claim 27 claims a "means on said carrier for supporting an elongated time delay detonation element ..."

39. Although Atlas also suggests that claim 27 does not apply because the positional control means is not "external of said primer" it is clear that primer means the cast explosive material in this context and not the entire device. The positional control means of the accused device is external of the primer.

25 and 27 of the '621 patent but does not literally infringe any of the claims of the '296 patent.

### B. Infringement Under the Doctrine of Equivalents

Although the '296 patent has not been literally infringed, Austin urges that the patent is nevertheless infringed under the doctrine of equivalents because the accused device performs substantially the same function in substantially the same way to obtain the same result as its invention. *Thomas & Betts Corp. v. Winchester Electronics Div.,* 519 F.Supp. 1191, 1198 (D.Del. 1981). Austin first points out that most of the claims of the '296 patent clearly would be infringed by the Deckmaster were it not for the fact that those claims require some physical contact of the input portion of the delay unit with the downline. Austin then correctly notes the unrebutted record testimony which indicated that any artisan of ordinary skill in the art at the time would have known that the Austin invention could be practiced as well with a small fixed gap between the input portion of the delay unit and the downline as with contact between the two. Austin correctly concludes from these facts that the difference between Austin's "contact" and the Deckmaster's fixed small "gap" is not a material difference and that the Deckmaster performs substantially the same function in substantially the same way to obtain the same result.

Atlas responds, however, that Austin is barred from asserting that the difference between contact and a gap is immaterial. File wrapper estoppel precludes a patent owner from using the doctrine of equivalents to claim that which was surrendered in the course of proceedings in the patent office. Chisum, *Patents,* Vol. 4, §§ 18.05, 18–55 (1982). Atlas maintains that Austin surrendered the idea of a gap between the input portion of the delay unit and the downline when it amended claims 1 through 22 in response to a rejection by the examiner. Since at the same time, Austin also

filed a Rule 131 affidavit[40] in order to overcome the rejection, there is a dispute as to whether Austin's actions in amending its claims constitute a surrender of a gap for purposes of the application of the file wrapper estoppel doctrine.

More fully, the examiner rejected certain of the original Austin claims (now claims 1, 5, 14, 18) on the basis of anticipation by the Bowman and Postupack patents. Those claims as originally drafted recited that the delay element was held in "detonation transfer relationship" with the downline or that the delay element and downline were "slidably associat[ed]." In rejecting the claims, the examiner stated (referring to the Bowman and Postupack patents):

> Claims [1, 5, 14, 18, comprising all of the independent claims other than Claim 23] are . . . rejected under 35 U.S.C. § 102 as clearly readable on either Postupack, et al. or Bowman, et al. The support means [of Postupack and Bowman] 30 [ (sic) presumably intended to be "39"] is obviously external of Primer 3, holds the element 24 spaced from the primer, and is in slidable but detonating relationship with detonation cord 40.

In response to the rejection, Austin filed a Rule 131 affidavit stating that it had reduced its invention to practice prior to the March 9, 1976 filing date of the Bowman and Postupack patents. At the same time, Austin amended those claims, as previously noted, by adding the requirement that there be physical contact between the input end of the delay element and the downline.

The examiner, in the next office action, withdrew his previous rejection:

> The affidavits submitted under 37 C.F.R. § 1.131 purporting to overcome the cited references to Postupack et al. 4,060,033, and Bowman et al 4,060,034, have been carefully considered and accepted. The previous rejections on these references is [sic] accordingly withdrawn.

The parties agree that if the examiner relied upon Austin's narrowing of claims 1–22 in causing those claims to be issued,

---

**40.** 37 C.F.R. § 1.131.

this is a classic case for application of file wrapper estoppel and Austin may not now assert that those claims cover a device with a small fixed gap. The parties also appear to agree that the file wrapper estoppel doctrine is inapplicable if there was no causal nexus between the narrowing amendments and the issuance of these claims.[41] The parties disagree, however, as to whether the record shows such a causal nexus. I conclude that it does.

Under Rule 131, an applicant may overcome a rejection of a claim by affidavit if the rejection is based on reference to a domestic patent which "substantially shows or describes but does not claim the rejected invention." 37 C.F.R. § 1.131. In order to do this, the applicant must make oath to facts which "establish reduction to practice prior to the effective date of the reference coupled with due diligence from said date to a subsequent reduction to practice or to the filing of the application." *Id.* If a rejection is based on reference to a domestic patent which *claims* the rejected invention, however, the applicant must proceed by way of interference to overcome the rejection. *E.g., In re Teague,* 254 F.2d 145, 45 CCPA 877 (1958); *In re McIntosh,* 230 F.2d 615, 43 CCPA 845 (1955).

Thus, in order for an examiner to accept a Rule 131 affidavit and approve the issuance of claims on the basis thereof, he or she must conclude that the prior reference discloses but does not claim subject matter which is also claimed by the applicant. *In re Hidy,* 303 F.2d 954, 49 CCPA 1152 (1962); Note, *Rule 131 Affidavits In Patent Law and Practice: Transformation from Rule to Reason,* 34 Geo.Wash.Univ.L. Rev. 507, 510 (1966). In this case, the examiner undoubtedly concluded that Bowman did not claim the same subject matter as amended Claims 1–22 of the '296 application since Bowman claims only "a delay insert." It is apparent from an examination of Postupack, however, that he could not have reached the same conclusion as to that reference without relying on the amendment narrowing the claims of Austin's application.

Postupack claims "a delay booster assembly comprising a booster shell, explosive material in said shell, [a delay unit with a sensor] and a shock absorbing detonating cord tunnel member forming a part of the booster assembly through which tunnel a detonating cord can be passed, said sensor being so positioned with respect to said detonating cord that it lies adjacent to said cord." [42]

The only way in which the examiner could have concluded that Postupack did not claim subject matter claimed by amend-

**41.** *See International Manufacturing Co. v. Landon, Inc.,* 336 F.2d 723 (9th Cir.1964), *cert. denied,* 379 U.S. 988, 85 S.Ct. 701, 13 L.Ed.2d 610 (1965), (holding that one asserting file wrapper estoppel must establish such a causal nexus). I do not so hold. When file wrapper estoppel is applied to foreclose operation of the doctrine of equivalents, it is not applied in order to deprive the applicant of patent protection to which he or she is *not* entitled under the statutory criteria. To the contrary, in all cases in which file wrapper estoppel makes a difference, the examiner has erroneously deprived the applicant of the patent protection he or she is entitled to under the statutory criteria. If the doctrine is not designed to require the surrender of ill gotten gain, the requirement of a causal nexus may be inappropriate. Perhaps the objective of the doctrine is to assure the maximum possible exposure of an applicant's claim to the expert resources of the PTO. *See,* Chisum, *Patents,* Vol. 4, §§ 18.05[2], 18–58 (1982); Note, 54 St. John's L.Rev. 767–87 (1981). Whenever an applicant foregoes an appeal from a rejection in favor of a narrowing amendment, the area excluded by the amendment is prematurely removed from the administrative process and perhaps, a court should not thereafter grant that which the applicant thus removed from further agency consideration.

**42.** Postupack also claims such an assembly wherein "the sensor lies adjacent to but out of contact with said detonating cord." In a different context, the presence of this additional claim would suggest that Claim 1 should be read as not limited to a "gap" device. The specification, however, indicates that the claimed device is inoperative unless a gap is maintained, e.g. "premature actuation of the sensor is prevented by avoiding frictional contact between the sensor and the detonating cord downline." Col. 6, line 10. For this reason, the examiner apparently concluded that Claim 1 was limited to "gap" devices.

ed claims 1–22 of the '296 patent was to construe claim 1 of Postupack, against the background of its specification, as requiring a small gap between the input portion of the delay insert and the downline. This was, of course, consistent with Austin's argument to the examiner and permitted him to distinguish the Postupack claims from Austin's *amended* claims 1–22. This construction of Postupack would not, however, permit him to conclude that Austin's *unamended* claims 1–22 which encompassed a device with a "gap" were patentably distinct. One can say with confidence, therefore, that the examiner relied on Austin's narrowing amendments and would not have approved issuance of claims 1–22 of the '296 without them.[43] For this reason, I hold that Austin is estopped to assert that these '296 claims, by operation of the doctrine of equivalents, cover a device like the Deckmaster which has a small fixed gap between the input portion of its delay unit and the downline. It follows that the accused device infringes only claims 25 through 27 of the '621 patent.

## IV. THE VALIDITY OF THE '621 PATENT

Since Atlas's Deckmaster infringes claims 25 through 27 of the reissue patent, it becomes necessary to address Atlas's attack on the validity of that patent. Initially, it maintains that the reissue does not rest on an "error without deceptive intent" made in the prosecution of the '296 patent. To the extent this argument rests upon the proposition that an amendment deliberately adopted to avoid a prior art rejection cannot involve an "error" within the meaning of 35 U.S.C. § 251,[44] it is authoritatively

answered in *In re Richman,* 409 F.2d 269, 56 CCPA 1083 (1969). To the extent this argument rests on the assertion that Austin acted with deceptive intent while prosecuting the '296 patent, I have previously ruled that this issue should await the anticipated trial of the "fraud-on-the-patent-office" issues.

Atlas presses three other grounds for declaring the '621 patent invalid, however, which can be evaluated on the basis of the present record. It asserts that claims 25 through 27 of the patent fail to satisfy the definiteness requirement of Section 112. It also urges that those claims violate that portion of Section 251 which specifies that "no new matter shall be introduced into the application for reissue." Finally, it asserts that claims 25 through 27 purport to recapture that which was surrendered in the course of obtaining the original patent. None of these arguments is persuasive.

### A. Adequate Disclosure

In order to obtain a valid patent, the patent must fully disclose the invention. One aspect of this requirement is that the claims of the patent must clearly set forth the area in which the applicant seeks exclusive rights: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, Second ¶. The primary purpose of the definiteness requirement is to provide clear warning to others as to what constitutes infringement of the patent. Chisum, *Patents,* Vol. 3, §§ 8.03, 8–13 (1982). The standard for

---

**43.** The Postupack specification discloses nothing material which is not claimed in that patent. The examiner may have thus also concluded that Postupack does not anticipate a device having contact between the delay unit and the downline. Reliance on the Rule 131 affidavit would nevertheless have been appropriate to obviate the necessity of resolving the obviousness issues presented by Postupack and Bowman.

**44.** Section 251 provides:
Whenever any patent is, through error without any deceptive intention, deemed

wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.

judging whether the requirement is met is whether the language of the claims in fact provides such warning to one skilled in the pertinent art. *Id.* at 8–23.

Atlas points out that there are two references in claim 25 of the '621 patent to a "means" for securing the delay unit in proper relationship with the downline. While this is true, the two references are consistent and the claim read as a whole provides one of ordinary skill fair notice of the territory claimed. Therefore, claims 25 through 27 of the reissue satisfy the requirement of definiteness in Section 112, second ¶.

### B. *"New Matter"*

Atlas contends that new matter has been inserted in claims 25 through 27 of the '621 patent by the use of the terminology "positional control means" or "positional controlling structure ... for holding ... [the] input portion [of the delay unit] in a predetermined relationship with respect to [the downline]." This is said to include new matter because the specification of the original patent allegedly does not disclose "a structure for maintaining a small fixed gap." Def. Ans. Br. p. 82.

Section 251's prohibition against introducing "new matter" is a corollary of the requirement that the claims of the reissue claim the same "invention disclosed in the original patent." The issue presented when a "new matter" objection is raised is like that presented by a challenge under the first paragraph of Section 112 that claims do not claim an invention described in the specifications. *In re Rasmussen,* 650 F.2d 1212, 1214–15 (Cust. & Pat.App.1981); *In re Salem,* 553 F.2d 676, 682 (Cust. & Pat.App. 1977); *Application of Wertheim,* 541 F.2d 257, 265 (Cust. & Pat.App.1976). The purpose of the "new matter" requirement of Section 251 and the description requirement of Section 112 would appear to be the same: to assure that subsequently fashioned claims are entitled to the benefit of the

original filing date. *See* Chisum, *Patents,* Vol. 2, § 7.04 (1982).

Since the '621 patent is entitled to a presumption of validity, Atlas has the burden of proving that the invention claimed in claims 25 through 27 is not described in the '296 patent. It has not done so. Atlas relies on certain testimony of Brooke Calder, Austin's Vice-President of Manufacturing and one of the inventors of Austin's ADP. Calder testified that none of the figures of the '296 patent depicts a structure for maintaining a small fixed gap between the downline and the input portion of the delay element.[45] He did not testify, however, that the patent specification did not describe a device having a structure to maintain a small fixed gap between those elements.

While the figures of the '296 do not happen to depict a fixed gap device, the text which describes those devices makes it clear that the important thing is to maintain a detonation relationship between the input portion of the delay unit and the downline. Thus, these two elements in the several depicted devices are described as being held in "detonation relationship," (Col. 6, line 37); in "detonation association," (Col. 8, line 26); in a "detonation connection," (Col. 10, line 4); and in an "adjacent" position such that "the friction contact, if any, ... is relatively slight." (Col. 10, lines 58–59). Moreover, there is no language in the specification which would suggest that the invention is limited to devices such as those depicted which maintain either physical contact or a range of relationships no more remote than detonation association. Viewing the figures in the overall context of the specification, I am unpersuaded that the described invention fails to encompass devices having a structure which maintains a fixed gap detonation relationship between the input portion of the delay unit and the downline. I, thus, accept the examiners conclusion that claims 25 through 27 of the '621 patent do not contain new matter.

---

**45.** Calder did indicate that the device depicted in Figure 6 could easily be modified so as to maintain a fixed gap. Calder 821.

## C. *Recapture*

Atlas also suggests that the subject matter of "positional control" as claimed in the reissue constitutes an invalid recapture to the extent it encompasses a device having a structure for maintaining a fixed gap between the input end of the delay unit and the downline. This follows, according to Atlas, from the fact that Austin narrowed the original claims of the '296 patent to exclude devices which have no contact between these two elements.

A patentee cannot recapture by reissue the same subject matter which was given up during the prosecution of the original patent in order to secure that patent. *See Struthers Patent Corp. v. Nestle Co., Inc.,* 558 F.Supp. 747, 829 (D.N.J.1981); *Amp, Inc. v. Burndy Corp.,* 332 F.2d 236, 238 (3d Cir.1964), *cert. denied* 379 U.S. 844, 85 S.Ct. 84, 13 L.Ed.2d 49 (1964); *Dobson v. Lees,* 137 U.S. 258, 265, 11 S.Ct. 71, 73, 34 L.Ed. 652 (1890). In order for the recapture doctrine to be applicable, however, the claim of the reissue and the abandoned claim must be substantially identical. *Tee-Pak, Inc. v. St. Regis Paper Company,* 491 F.2d 1193, 1199 (6th Cir.1974). Thus, where the reissue claim is "more restrictive in at least one significant respect than the cancelled claim," the recapture doctrine is inapplicable. *In re Richman,* 409 F.2d 269, 274–5, 56 CCPA 1083 (1969).

The claims which Austin originally asserted during the prosecution of the '296 patent claimed any device which had a detonation relationship between the input end of the delay unit and the downline. This included devices in which these elements are held in contact, are held in a fixed, small gap relationship, or are held in a detonation association which involves contact at times and non-contact at others. These original claims were narrowed to include only contact devices, in response to the examiner's rejection, in order to distinguish the invention claimed in Postupack. There was no attempt to reassert these claims in the reissue, however.

In the reissue proceeding, Austin did not attempt to amend any of the claims which had been narrowed in the original. The primary focus of the reissue proceeding was not on claims 1 through 22 of the '296 patent but rather on the text of claims 23 and 24 of that patent. These claims did not require contact between the input portion of the delay unit and the downline but were of quite limited scope by virtue of the fact that they required "a structure external of said explosive element ... including a guideway matching said selected contoured path [of the delay unit] and means for securing a portion of said time delay unit into said guide structure." Austin's reissue application asserted that its invention would function without the guideway and that the inclusion of this limitation was "error without deceptive intent." Austin further asserted that it could and should have claimed in claims 23 and 24 that the "structure external of the primer" in its invention controls "the position of the input end of the elongated time delay element to establish a controlled and assured detonation relationship with the downline."

Based on these assertions, Austin requested allowance of three new claims, claims 25 through 27, which amended the text of claims 23 and 24 to eliminate any reference to a "guideway" and to include references to either (a) "a positional controlling structure external of said explosive element ... including ... means for holding said input end in a predetermined position with respect to said downline," or (b) means supporting the delay element "including positional control means external of said primer for holding said input portion in a predetermined relationship with respect to said detonating cord."

In support of these three new claims, Austin argued that they would have been allowed if they had been made in the original prosecution because neither Bowman nor Postupack disclosed a means for maintaining a predetermined relationship between the input end of the delay element and the downline. It urged, for example:

> There is no structure in these patents ... for controlling the position of the input end of the time delay element with re-

**1316**

spect to the downline. Without such positional control over the relationship between the downline or cord and the input of the time delay element, positive detonation of the delay unit cannot be assured. Such detonation uncertainty is not acceptable in the blasting art.

The examiner allowed these three new claims without further comment.

Claims 25 through 27 are significantly more limited than the unamended claims 1 through 22 surrendered by Austin in the original prosecution. These new claims claim only devices having a structure for maintaining a "predetermined relationship" between the input end of the delay unit and the downline. They would not, for example, encompass devices like that shown in Figures 12–14 of the '296 patent [46] or any other device which permits "play" in the spacial relationship between the input end and the downline. For this reason, I find the instant situation indistinguishable from that presented to the Court of Customs and Patent Appeals in *In re Richman, supra.* As in the *Richman* case, it was not necessary for Austin to surrender as much to overcome the examiner's rejection on Postupack as it originally surrendered. The examiner during the reissue [47] apparently took the view not only that Postupack was limited to gap devices but also that it did not disclose a structure for maintaining a predetermined relationship between the input end of the delay unit and the downline. Accordingly, like the Court in *Richman,* the examiner allowed the patentee to claim some, but less than all, of the area surrendered in the original prosecution. I am constrained by *In re Richman* to hold that claims 25 through 27 of the '621 patent do not constitute an impermissible recapture.

I am not persuaded that the examiner erred in concluding that claims 25 through 27 would properly have been allowable without an interference in the original prosecution. As earlier explained, after full litigation of the issue, I agree with the examiner that Austin was the first to conceive and reduce to practice. Moreover, given the intended use of the device disclosed in Postupack and Bowman, there is ample justification for his apparent conclusion that their "slot in foam" arrangement does not constitute positional control means for assuring the maintenance of a "predetermined relationship" between the input end of the delay unit and the downline. In this regard, I have the benefit not only of the information before the examiner but also of extensive evidence establishing that devices made in accordance with the teachings of these patents do not in fact assure a predetermined relationship in use.

## V. THE '247 METHOD PATENT

■ Austin argues that its '247 method patent is also infringed. As earlier noted, the '247 patent claims a method of "decking" whereby a borehole is loaded with alternating segments of explosive and nonexplosive materials and delay primers are slid by means of a detonating cord downline onto the segments of explosive material. The single claim of the patent is limited to decking with a delay primer having a "delay element with an inlet cord" which is maintained "in slidable contact" with the downline.

Although Atlas has practiced decking, it has only done so using its own devices. Since these devices have a sensor rather than an inlet cord and the sensor is not maintained in physical contact with the detonating cord, there has been no literal infringement of the method patent. Austin urges that, nevertheless, there has been infringement under the doctrine of equivalents.

The '247 patent claims, like the '296 claims, were amended during prosecution. As originally submitted, the '247 claims claimed the use of decking with a primer "isolated from detonation by [the downline] and coupled with a detonation time delay element extending between said cord and said ... primer." *See, e.g.,* claim 49, '247 file wrapper, PX–20. The examiner, who

---

**46.** This is the device shown in Figure 3, *supra.*

**47.** The examiner during reissue was also the examiner in the original prosecution.

was the same as the examiner prosecuting the '296 patent, rejected the claims under 35 U.S.C. § 102 as anticipated by the disclosures of Bowman and Postupack. In response, in order to define over these references, Austin amended its claims to limit the claimed method to "contact" situations and the examiner then granted the patent. Austin did not file a Rule 131 affidavit claiming an earlier date of reduction to practice as it had done with the '296 apparatus claims. Thus, Austin obtained its '247 patent because it limited its claims to contact and under the doctrine of file wrapper estoppel Austin cannot now claim the broader matter it surrendered in the patent office. Accordingly, Atlas has not infringed the '247 patent.

## VI. CONCLUSION

I have thus concluded that the '296 patent is valid but not infringed. I have further concluded that the '247 patent is not infringed. Finally, I find that claims 25 through 27 of the '621 patent, if valid, have been infringed, that they are neither indefinite nor involve new matter, and that they do not improperly recapture subject matter previously surrendered. I reserve for later determination whether the '621 patent resulted from an "error without deceptive intention" in the earlier proceeding, whether it is unenforceable because of fraud on the patent office, whether if Atlas has infringed the patent it has nevertheless acquired intervening rights under 35 U.S.C. § 252, and whether any infringement was willful on the part of Atlas.[48]

---

**48.** The willful infringement issue was litigated during the initial trial although it was not mentioned by Atlas in the post-trial briefing. The issue of intervening rights was also litigated. It will be unnecessary to decide these issues, however, unless and until it is determined that the '621 patent is valid and enforceable. If it turns out to be necessary to resolve these issues, they will be resolved on the basis of the present record.