**MINE SAFETY APPLIANCES COMPANY and Catalyst Research Corporation, Plaintiffs,**

v.

**BECTON DICKINSON AND COMPANY, Defendant.**

**No. 75 Civ. 4925 (MEL).**

United States District Court,
S.D. New York.

Sept. 14, 1990.

Kaye, Scholer, Fierman, Hays & Handler, New York City (Richard J. Halloran, of counsel), and Reed Smith Shaw &

McClay, Pittsburgh, Pa. (Arland T. Stein, of counsel), for plaintiffs.

Harry Litwin, New York City (Andrew E. Taylor, Larson and Taylor, Arlington, Va., of counsel), for defendant.

LASKER, District Judge.

Mine Safety Appliances Company and its subsidiary Catalyst Research Corporation ("Mine Safety") commenced this action seeking a declaratory judgment that patents held by defendant Becton Dickinson and Company are invalid or are not infringed by certain gas detectors (known as "MiniCo I, II, III, and IV") manufactured by Mine Safety. Becton Dickinson ("BD") counterclaimed, alleging infringement by Mine Safety. The parties have resolved all issues but one: the question of Mine Safety's intervening rights pursuant to 35 U.S.C. § 252 to continue the manufacture of its gas detectors despite the subsequent reissue of U.S. Patent No. 3,772,832 (Reissue No. RE 31,916).

Both parties have moved for summary judgment on this issue. I conclude that intervening rights do apply to Mine Safety's continued manufacture of its gas detectors, but that Mine Safety must pay a reasonable royalty on sales subsequent to the reissue of patent No. RE 31,916, to be determined by the parties or by me at a future date.

I

The parties have stipulated as to all relevant facts.

BD's predecessor in interest, Energetics Science, Inc. ("ESI"), applied for and received in December 1973 and July 1974 U.S. Patents 3,776,832 (" '832 patent") and 3,824,167 (" '167 patent"). The claimed subject matter of these patents was incorporated in an ESI product known as the "Ecolyzer." In addition, in September, 1975, ESI secured another patent (No. 3,909,386 (" '386 patent")), and in November, 1976, it obtained Patent 3,992,267 (" '267 patent"). Both of these also related to gas detection methods.

Some time around June of 1975 Mine Safety began manufacture of a gas monitor known as the "Model 70." On October 6 of that year Mine Safety commenced the present action seeking a declaratory judgment finding the '832 and '167 patents invalid and unenforceable against Mine Safety. BD counterclaimed, alleging that Mine Safety's manufacture of Model 70 infringed the '832, '167 and '386 patents, and subsequently amended its Counterclaim to allege infringement of the '267 patent. Mine Safety continued to press its claims of the invalidity and noninfringement of all four patents.

In April, 1981, following several years with no apparent progress in this dispute, BD (which had by then succeeded ESI) became aware of prior art in foreign patents which called the validity of its four patents into question. It therefore filed substantively narrower claims for reissue of the '832, '167 and '267 patents and cancelled its claims on the previously issued patents. Patent proceedings resulted in the issue of reissue Patent Nos. RE 31,914, RE 31,915, and RE 31,916, which correspond to the '267, '167, and '832 patents, respectively, but each of which is substantively narrower than its earlier cousin.

The parties have agreed that Mine Safety's products Model 70 and 71 made through August, 1980 contain devices covered solely by the invalid claims of the '832, '167 and '267 patents, and that since that date those models have been modified so as not to infringe either the original or reissued patents. That element of the case no longer is in controversy.

The remaining controversy concerns devices subsequently introduced and marketed by Mine Safety, MiniCo Models I, II, III, and IV, all of which contain technology covered by the '832 patent and by Reissue Patent No. RE 31,916. The parties agree that the cancellation of the '832 patent leaves BD with no viable claim concerning those MiniCo units sold before the reissue date of June 18, 1985. Each device continues to be marketed (along with a noninfringing Model V), and each admittedly contains technology covered by RE 31,916. BD seeks royalties on those units sold after the reissue date.

Mine Safety had developed a substantial business in its MiniCo line prior to the reissue of BD's patent. It employed a direct sales force of over 100 and an authorized distributorship network of over 700. By June 18, 1985, Mine Safety had realized sales of $2,688,351 and profits of $840,000 on its MiniCo models.

## II

■ The governing statute is 35 U.S.C. § 252, which establishes "intervening rights" by providing in part:

No reissued patent shall abridge or affect the right of any person or his successors in business who made, purchased or used prior to the grant of a reissue anything patented by the reissued patent, to continue the use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use or sale of the thing made, purchased or used as specified ... prior to the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue.

As the statute suggests, the Court's inquiry is in two stages. It must first be determined whether intervening rights apply—that is, whether the alleged infringer's activities fall within the reissue patent but are not covered by an identical provision of the now-revoked predecessor patent. If that threshold is met, the Court then must determine under what terms it will be equitable for the alleged infringer to continue to exploit its intervening rights. *See Seattle Box Co., Inc. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 829–830 (Fed.Cir.1984).

### A. Mine Safety Did Acquire Intervening Rights

■ *Seattle Box, supra,* provides useful guidance on the standard for determining whether intervening rights are available in a given case. The Court ruled that intervening rights do not attach where the previous patent and its successor reissue patent are identical, but that where the claims in the reissued patent "are substantively different than those in the original patent," intervening rights are properly triggered. 731 F.2d at 830 (citing *Cohen v. United States*, 487 F.2d 525, 203 Ct.Cl. 57, 179 U.S.P.Q. 859 (1973)); *see also Austin Powder Co. v. Atlas Powder Co.*, 593 F.Supp. 208, 215–216 (D.Del.1984).

Here the parties have stipulated that the original '832 patent was substantially broader than the subsequent RE 31,916. That difference satisfies Section 252's requirement as elucidated in *Seattle Box* that the previous patent not be identical to the reissue patent for intervening rights to attach. *See* 731 F.2d at 830. *See also Fortel Corp. v. Phone–Mate, Inc.*, 825 F.2d 1577, 1580 (Fed.Cir.1987) (quoting *Seattle Box* for the proposition that the reissue patent's effectiveness reaches back to the date of the original patent "only if those claims are identical with claims in the original patent").

Furthermore, it is undisputed that Mine Safety began manufacture, marketing and distribution of its models which include technology covered by the reissue patent before the June, 1985 issue of RE 31,916, and that they expended roughly $570,000 [1] in preparations to market their product, or that before June 18, 1985 Mine Safety had realized sales of $2,688,351 and profits of approximately $840,000.

### B. Equitable Terms for Mine Safety's Continued Enjoyment of Intervening Rights

■ Under 35 U.S.C. § 252, a court's discretion to fashion the terms of future

---

1. This figure excludes plaintiffs' roughly $130,000 legal fees in anticipation of marketing their product. Whether or not this figure should be included in plaintiffs' market preparation expenses is disputed by the parties but is not a necessary element of the Court's determination. Whether or not the legal fees are included as a development expense, plaintiffs realized a significant profit prior to the reissue date of June 18, 1985.

dealings is extremely broad, including, for example, the power to limit use of infringing goods to specific items already in existence; to limit the amount, type, or geographical location of exercise of intervening rights; or to permit the unconditional enjoyment of those rights. *See Seattle Box,* 731 F.2d at 830.

In the case at hand, Mine Safety's substantial operations (as signified by its investment in product development) constitute the type of activity whose protection Section 252 contemplates. Because Mine Safety operates a substantial enterprise developed before the reissue date, and because numerous customers rely on the continuity of that business, it would be inequitable to terminate or substantially curtail its operations.

■ This brings us to the nut of the problem—whether Mine Safety should be required to pay royalties to BD and, if so, what those royalties should be. Mine Safety argues it should be free to continue to manufacture its products without any payments to BD. As equitable considerations supporting this result, Mine Safety invokes its substantial investment in product development and marketing, its extensive sales prior to the reissue date, the existence of a substantial sales force and distribution network, and the dependence of its customers on the continued availability of Mine Safety's products and services.[2] It also refers to its reasonable reliance on counsel's opinion of noninfringement before introducing its now-infringing products and BD's asserted delay in filing for reissue as reasons the Court should decline to impose a royalty.

BD argues that the equities favor the imposition of royalties largely by discounting Mine Safety arguments to the contrary. BD notes that Mine Safety's investment has already been protected because it has realized profits on its MiniCo Models I–IV prior to issue of RE 31,916. BD contends that any delay in its application for a reissue patent benefited Mine Safety since during that time Mine Safety in fact used the patented technology free of charge, and since any delay in obtaining a reissue patent actually shortened BD's enjoyment of the technology's exclusive use.

Moreover, BD points out that courts have typically found the imposition of royalty payments to be equitable under Section 252 provided the infringer has recouped initial investments. *See, e.g., Wayne–Gossard Corp. v. Sondra, Inc.,* 434 F.Supp. 1340, 1363, 195 U.S.P.Q. 777, 797 (E.D.Pa.1977), aff'd 579 F.2d 41, 200 U.S. P.Q. 11 (3rd Cir.1978). BD observes that Mine Safety has taken advantage of BD's efforts by reverse engineering BD products to develop its own early products.

Mine Safety's position is not persuasive. Before the reissue date, Mine Safety had already realized a considerable profit from sales of the affected products, and its operations presumably continue to generate profits. Accordingly it appears that the requirement to pay royalties would not fail to protect Mine Safety's investments, nor would it prevent the continued vitality of Mine Safety's business or leave unmet the needs of its customers.

BD's delay in seeking a reissue patent, which may have been justified given the apparently late discovery of foreign prior art, did in any event benefit Mine Safety by permitting Mine Safety to market its infringing detectors in that period without paying royalties. Any delay in the application for a reissue patent only disadvantages the infringing party if that delay caused the patentee to enjoy an extended monopoly under an unjustified patent. That is not the case here.

The requirement that Mine Safety pay royalties is equitable because it compensates BD for the use of technology which it developed, and on which it now holds a

---

**2.** Mine Safety also has asserted energetically that in fashioning equitable terms for the exercise of intervening rights the court should consider costs Mine Safety would incur in converting its products to avoid infringing RE 31,916. That question, however, is irrelevant to the im-

position of royalties which would allow Mine Safety to continue to manufacture goods which fall within the reissue patent. The relevant inquiry is how adequately to protect Mine Safety's investment and ongoing business.

patent. Mine Safety's intervening rights are adequately protected by allowing it to continue its current product line, while allowing BD to recognize the value that ordinarily accompanies the issuance of a valid patent.

There remains the question of the rate at which royalties should be paid on royalties payable. The papers submitted by the parties appear to suggest that they have stipulated that in the event the court rules that royalties are payable, they shall be payable at the rate of 6%. Accordingly, that rate shall govern unless the parties advise that this reading of their papers is not correct. Interest, at an appropriate rate, shall be payable on royalties due for the period June 18, 1985 until the entry of judgment.

Submit judgment on notice.